# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ADRIAN HARPER
        **Petitioner-defendant,**

    **v.**
                               **Case No. 19-C-1109**
                               **(Criminal Case No. 17-CR-146)**

UNITED STATES OF AMERICA
        **Respondent-plaintiff.**

## DECISION AND ORDER

In this action under 28 U.S.C. § 2255, petitioner Adrian Harper moves to vacate his conviction, following a jury trial, of felon in possession of a firearm, arguing that this lawyer provided ineffective assistance. I held hearing on the motion, at which petitioner's trial counsel was the only witness, and the parties then submitted post-hearing briefs.

While conceding that his lawyer "put up a good fight" (R. 17 at 50), petitioner now presents an alternate theory of defense, which he contends would have stood a better chance of success. But petitioner fails to show that his lawyer's strategic decision as to how best to defend the case was unreasonable. Nor does he demonstrate a reasonable probability of a different outcome had counsel pursued the alternate defense. I thus deny his motion and dismiss this action.

## I. FACTS AND BACKGROUND

### A. Underlying Criminal Case

The government charged petitioner with possessing a firearm as a felon, 18 U.S.C. § 922(g)(1), and the court appointed Attorney Christopher Donovan to represent him. Following

litigation of a motion to suppress, the case proceeded to trial on January 16, 2018. The parties stipulated that the firearm had traveled in interstate commerce, and that defendant had previously been convicted of a felony. (Trial Tr. at 120-21.) Whether defendant possessed the gun was the only issue in dispute.

Milwaukee Police Officer Jose Rivera testified that on July 3, 2017, he and his partner Casey Donahue were on patrol along with another squad car containing Officers Robert Gregory and Justin Schwarzhuber, also part of the anti-gang unit. During that patrol, Rivera turned north onto 23rd Street from Keefe Avenue, observing three subjects standing on the sidewalk on the west side of the street. Upon seeing the marked squad car, one of the subjects, a man with braided hair wearing a gray shirt and red shorts, turned away from the squad car and with his right hand threw a black object into the yard behind him. (Trial Tr. at 65-66.) Rivera's body camera, active at the time, did not capture what Rivera saw, but it did record his contemporaneous statement, "Uh-oh. Oh, he threw it. He threw a gun right there, braids." (Trial Tr. at 72.) Rivera testified that he was 100% sure the man with the braids threw the gun. (Trial Tr. at 72.)

Rivera pulled over, exited the squad, and approached petitioner, then directed Officer Donahue to the spot where he observed the object thrown; Donahue recovered a firearm from that location. The man with the braids was later identified as petitioner. (Trial Tr. at 73.)

Donahue testified that, after initially going to the east side of the street, where Officers Gregory and Schwarzhuber had encountered a different man with braided hair, he ran over to the west side of the street, where Rivera was speaking with petitioner. (Trial Tr. at 123-24.) Rivera directed Donahue to a spot in the grass, where Donahue recovered a handgun. (Trial Tr. at 125.) Donahue's body camera video, introduced at trial, showed him finding the gun

2

exactly where Rivera said it had been tossed.  (Trial Tr. at 127-28.)

Donovan defended the case on the theory that Rivera was mistaken.  In closing arguments, Donovan stressed that Rivera had a short amount of time to observe petitioner, just a few seconds, from a distant and partially obstructed vantage point.  Donovan further noted that the police did not find petitioner's DNA or fingerprints on the gun; no one other than Rivera saw petitioner toss the gun; other individuals were present near the yard where the officers found the gun, but the police questioned none of them; petitioner cooperated with the officers when they approached, admitting he was a felon but denying he threw the gun; and petitioner did not own the gun, which had been reported stolen about five months before this incident. (Trial Tr. at 132-46.)

The jury, after reviewing the body camera video and deliberating for about an hour, returned a guilty verdict.  I subsequently denied a motion for acquittal under Fed. R. Crim. P. 29, then imposed a sentence of 77 months running consecutively to a 7 month sentence after revocation.[1]  The Seventh Circuit dismissed petitioner's direct appeal as frivolous.  United States v. Harper, 756 Fed. Appx. 656 (7th Cir. 2019).

**B.      Section 2255 Proceedings**

In a pro se § 2255 motion, petitioner argued that Donovan provided ineffective assistance by failing to call as witnesses Officers Gregory and Schwarzhuber and to present Gregory's body camera footage.  After screening the motion under Rule 4 of the Rules Governing Section 2255 Proceedings, I directed the government to respond, and in that response the government recommended that the court hold an evidentiary hearing.  After

---

[1]Petitioner was at the time of this incident on supervised release for a previous felon in possession offense, for which he had been convicted by a jury in my court in 2010.

3

appointing counsel to represent petitioner in the § 2255 proceeding, I held a hearing.

At the hearing, Donovan testified that he considered calling Gregory and Schwarzhuber but decided against it. (Evid. Hr'g Tr. at 9.) Donovan indicated that Gregory had stopped another individual across the street from petitioner around the same time,

> and [Gregory] basically said something to the effect on his body camera, this guy has a permit, meaning that the guy that he stopped, [but a] random dude across the street threw a gun, according to Rivera. And so my feeling was I didn't want to reinforce that Rivera may have seen him throw a gun. I thought the jury could draw the inference that, you know, he's corroborating Rivera, in other words, which I didn't want.

(Tr. at 9:19-25.) Donovan explained that he "wanted to keep things as clean as possible and not muddy the waters." (Tr. at 10:3-4.) He further indicated that neither Gregory nor Schwarzhuber had prepared reports about petitioner's arrest on the other side of the street. Donovan used his own judgment in deciding not to call these witnesses; he did not recall petitioner asking him to do so. (Tr. at 10.)

Donovan testified that the government produced Gregory's body camera video later as compared to Rivera's, about a week before trial, but he did have time to review it. (Tr. at 11-12.) The video generally showed that Gregory and Schwarzhuber were in a squad car in front of Rivera and Donahue; they approached a man on the other side of the street, dressed in black and with long dreadlocks, who was found to have a gun but was not charged because he had a CCW permit. (Tr. at 11.) Donovan testified that, while he did not have an independent recollection, he believed that he decided not to use Gregory's body camera video for the same reason he did not call Gregory as a witness, i.e., he was concerned it could end up corroborating Rivera's claim that petitioner threw a gun on the other side of the street. (Tr. at 12.) Donovan also questioned how he would lay a foundation to introduce the video without

4

Gregory there as a witness. (Tr. at 13.)

Donovan detailed his trial preparation, which included reviewing all the discovery, particularly Rivera's body camera footage, which he considered the key piece of evidence. He then focused on things they could attack, including Rivera's distance from the scene, his obstructed view, and the presence of others nearby who could have thrown the gun. (Tr. at 13.) In opening statements and closing arguments, he focused on the evidence the government did not have (i.e., fingerprints or DNA) and the different ways in which Rivera's ability to perceive these events would have been compromised. (Tr. at 14.) Donovan and petitioner discussed the strategy, which was to show that Rivera was mistaken. (Tr. at 14-15.) Donovan testified that he and petitioner were "pretty much on the same page." (Tr. at 15:6.)

After the direct appeal was dismissed, petitioner wrote Donovan a letter, and Donovan responded, including a draft of a Rule 29 motion he had prepared (but never filed) in which he discussed Gregory's body camera video. (Tr. at 15; R. 2-1.) In the draft excerpt, Donovan attempted to formulate a response to the government's argument that Rivera's contemporaneous statement about "braids" corroborated his testimony; Donovan wrote that Gregory's body camera footage cast doubt on this contention. After noting that the police had stopped another man with braids across the street, Donovan wrote:

> Officer Gregory at time marker 3:14 of his body camera footage says something to the effect of "*Dude we were told about* has a [CCW] permit, but a random dude across the street threw a gun right in front of [Officer] Casey and Jose [Rivera.]" (emphasis added). At the time marker 5:50 he says "Anthony's all good," which must be the name of the person across the street with braids who they determined had a CCW permit, and which the video shows was released from police custody on scene.

5

(R. 2-1 at 3, emphasis in original.)[2]  In the draft excerpt, Donovan proceeded to argue that the officers were not on random patrol at the time but rather had previously obtained information that a person with braids had a gun.  (R. 2-1 at 3.)  He further argued that, had this information been communicated to Rivera, Rivera may have already been primed to look for an individual with braids possessing a gun; therefore, he blurted out, "Uh-oh.  Oh, he threw it.  He threw a gun right there, braids" not because he saw petitioner throw a gun, but because he saw someone throw a gun and was running on the assumption that it was a person with braids.  (R. 2-1 at 4.)

At the evidentiary hearing, Donovan testified that, as he told petitioner in the letter, he ended up cutting this argument out of the Rule 29 motion because it was too speculative.  (Tr. at 16.)  Donovan explained that while he suspected this was not a random patrol, he was unable to confirm that suspicion with evidence.  (Tr. at 16-17.)  He made an open records request to investigate, but no report detailed the police being directed to the scene or being told someone there had a gun.  (Tr. at 17; R. 2-1 at 3-4 n.1.)  He testified that while he believed the officers already had information that somebody with braids had a gun, and that's why they went there, "I couldn't ever prove that, no records corroborated that."  (Tr. at 17:9-10; see also Tr. at 31:21-22, "I couldn't get any reports or anything else to confirm that.".)

At the evidentiary hearing, Donovan second-guessed whether he should at trial have made more of the guy across the street with braids, but he testified that, at the time, he decided to keep the focus on petitioner's side of the street and what Rivera saw.  (Tr. at 17.)  Donovan

---

[2]Gregory's body cam video, introduced at the evidentiary hearing, confirms the quoted statements.  At time marker 5:15, while running a check on the man he had stopped, Gregory further stated that a "guy over there threw a pistol while they were watching him."

indicated that he had good arguments for the jury to consider in that regard, although they did not lead to an acquittal.  (Tr. at 18.)

On cross-examination by petitioner's post-conviction counsel, Donovan testified that he did not think he could show Rivera was lying and so focused on proving Rivera was mistaken. He did not view this as a credibility issue (although he did check Rivera's disciplinary records, finding none). (Tr. at 21.)  Donovan agreed that this was a close case, and that the government at trial made much of Rivera's "braids" comment. (Tr. at 25-30.)  While he wished that he could have done more to rebut the braids comment (Tr. at 33:18-19), at the time he decided "to keep the focus on Rivera and just have one person to attack and not have his observation corroborated." (Tr. at 34:7-9.)  He worried that Gregory's comment about a "random dude across the street" throwing a gun could corroborate Rivera.  (Tr. at 34-35.)

At the evidentiary hearing, petitioner introduced Gregory's body camera video, during which Gregory advised dispatch of an "investigation" at 23rd and Keefe shortly before this encounter. (Tr. at 37-38.) Petitioner also introduced the police "CAD" report, which referenced an "investigation" at the location of 23rd and Keefe.  (Tr. at 39.)  On his body camera video, Gregory is heard saying "right here" and is seen pointing at the right (east) side of the street. (Tr. at 41.)  The video goes on the show the officers confront the other man across the street, an African-American dressed all in black and with long dreadlocks, asking him if he had a gun. (Tr. at 41-42.)   Plaintiff also introduced Schwarzhuber's body camera video, which also captured these events.  (Tr. at 44-45.)

Donovan confirmed that Rivera, like the other officers, had activated his body camera before they turned onto 23rd Street.  (Tr. at 46.)  Petitioner introduced a copy of the Milwaukee Police Department operating procedure for body cameras, which indicates that officers are to

7

activate their cameras when arriving on a scene to engage in an investigation. (Tr. at 50.) In this case, it appeared the officers had their cameras on before they saw petitioner. (Tr. at 51.) Donovan testified that this furthered his suspicion that the officers were not there randomly. (Tr. at 51.)

Petitioner also introduced a portion of the Gregory and Schwarzhuber squad dash cam video, which showed that the lights were on and that they drove above the speed limit en route to the scene. (Tr. at 56.) Donovan testified that he reviewed this video prior to trial as well, noting that it did not prove or disprove whether petitioner threw the gun. (Tr. at 58.) During the brief portion in which petitioner appears visible in the dash cam video, he did not turn away and throw the gun.[3] (Tr. at 63.)

On re-direct, Donovan confirmed that one of his themes during the trial was that no one other than Rivera saw petitioner throw the gun, and that what Rivera saw was not captured on video. (Tr. at 67.) During closing argument, Donovan also addressed the fact that the other officers on the scene (i.e., Gregory and Schwarzhuber) did not see petitioner with a gun, as follows:

> But think about here you have a squad car in front of Officer Rivera and Officer Donohue's squad car, two officers in that squad car, they don't see anything. They're not even called as witnesses. And think about why not. Because if they had seen him toss the gun, do you think you'd be hearing from them? You bet you would. So they don't see him.

(Tr. at 68, quoting the trial transcript.)

The government asked Donovan what he would have done differently had the additional videos been presented to the jury.

---

[3]At the trial, the parties stipulated that the dash cam in the Rivera/Donahue squad was not activated as the officers approached. (Trial Tr. at 120:13-17.)

8

A. Well, I think what I would've done differently is that would've supported, I think, like what I always thought which was that they weren't there randomly, and I might've done more to argue, they already were looking for someone with braids, and so when Rivera yells out "braids", he's already got that in mind, and then that's -- that's why he said it not because he actually saw Mr. Harper throw but because he was looking for someone with braids.

       And then I would loop that back into the arguments I already made, which is like, look, there's multiple other people that were right next to Mr. Harper, and maybe he did see somebody throw something, but for all the other reasons that I already did cover, we don't know that it was Mr. Harper beyond a reasonable doubt.

Q. But Rivera either saw what he saw on the west side of the street or he didn't, right? And you gave the jury plenty of reasons to doubt that he saw what he said he saw?

A. I tried to give the jury as many reasons as I could that Rivera was wrong.

Q. Okay.

(Tr. at 68-69.)

## II.  DISCUSSION

**A.    Ineffective Assistance Standards**

To demonstrate ineffective assistance of counsel, petitioner must show (1) that his attorney's performance was objectively deficient and (2) that the deficient representation caused him prejudice.  Hicks v. United States, 886 F.3d 648, 650 (7th Cir. 2018) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  "A defendant's failure to establish either prong of the test is fatal to his ineffective assistance of counsel claim."  Carter v. Butts, 760 F.3d 631, 635 (7th Cir. 2014).

The court's scrutiny of an attorney's performance is highly deferential, eliminating as much as possible the distorting effects of hindsight and indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Vinyard

9

v. United States, 804 F.3d 1218, 1225 (7th Cir. 2015). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. Accordingly, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. Vinyard, 804 F.3d at 1225.

The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011).

**B.    Analysis**

Petitioner argues that Donovan should have presented a different and more elaborate theory of defense: the officers, despite suggesting a routine patrol, were actually in the area investigating a tip about a black man with braids who had a gun; and because he had braids on his mind, Rivera assumed because of his hairstyle that petitioner was the one who tossed the gun into the yard. (R. 17 at 32-33.)

Donovan testified that he considered mounting such a defense but decided instead to adopt a cleaner approach: arguing that Rivera was simply mistaken. As he indicated at the hearing, and as his closing argument demonstrated, Donovan was able to press no less than 13 reasons why the jury should find reasonable doubt that Rivera observed petitioner toss the gun. The record establishes that Donovan made this decision after a sufficient investigation.

10

He reviewed the additional videos petitioner now argues he should have used,[4] deciding that they were either inconclusive or (in the case of Gregory's body cam) potentially damaging.[5] He also made an open records request to gather any reports on the possible investigation at 23rd and Keefe, finding none. Ultimately, he concluded that he could not confirm his suspicions.

At the hearing, Donovan expressed regret about not doing more to rebut the "braids" comment (R. 17 at 43), but any conscientious lawyer would after losing a trial wonder what he could have done differently. See Richie v. Mullin, 417 F.3d 1117, 1123 (10th Cir. 2005) (noting that even if counsel denigrates his own performance at the post-conviction hearing, the court's

---

[4]In his post-hearing briefs, petitioner contends that because the government produced the videos shortly before trial Donovan lacked time to exhaustively review them and thus did not realize their import. (R. 17 at 2; R. 22 at 2-3, 10.) The record does not support this argument. While the additional videos came in later, Donovan's testimony establishes that he had sufficient time to review them and to then make a strategic decision about their use. Contrary to petitioner's suggestion in reply (R. 22 at 4, citing Couch v. Booker, 632 F.3d 241, 246 (6th Cir. 2011)), Donovan knew what these videos showed and did not show. Thus, this is not a case where counsel conducted an incomplete investigation of the evidence, as petitioner suggests (R. 22 at 4-6, 10), but rather one in which petitioner has been able to come up with a different use for the evidence.

[5]Petitioner suggests that perhaps Donovan could have called Gregory as a witness without playing his body cam video, asking him leading questions about what the videos showed and forcing him to admit they went to the area to investigate this other man with braids. (R. 17 at 41-42.) It is entirely speculative that Gregory could have been forced into making such an admission, for the reasons discussed on pages 12-13 below. Petitioner also contends that, if played, Gregory's body cam recording could have been stopped before his "random dude across the street comment," and that Donovan did not need to fear that this hearsay statement "would necessarily come into evidence." (R. 17 at 42.) But as this careful phrasing suggests, Donovan's concern that calling Gregory might backfire was not unreasonable. I need not explore in detail the evidentiary issues that may have arisen; it suffices to note that Gregory's comments suggested a ready rejoinder to petitioner's new theory: the officers may have been there to investigate another man, but then petitioner (the "random dude") threw a gun in front of Rivera. Petitioner argues it would have been risk free to present the additional evidence, but he cannot know what the government would have done in response had he pursued the alternate theory. Donovan, on the other hand, made a strategic decision to keep things simple rather than potentially opening the door to evidence corroborating Rivera.

duty is to avoid the pitfalls of hindsight and judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct). Because Donovan made a reasonable strategic decision to present a cleaner, more streamlined defense, petitioner cannot establish the performance prong.

Nor can petitioner show prejudice. Petitioner contends that the additional evidence he presented at the hearing provides an explanation as to why Rivera would have shouted "braids": the police were there looking for a man with that hairstyle. (R. 17 at 2, 48; R. 22 at 1, 5, 7, 9.) This overstates the evidence. The CAD report mentions an "investigation" but does not further elaborate; the officers turned on their body cameras, which, according to MPD policy, is done during an investigation, prior to the encounter; on his body cam video, Gregory mentions an "investigation" on "two three and Keefe" just before the encounter and later refers to the "Dude we were told about"; and the man Gregory and Schwarzhuber confronted on the other side of the street happened to have a somewhat similar hairstyle to petitioner. But petitioner has introduced no evidence that the police went to this location looking for a man with a gun who had hair like his. The additional evidence contains no description of "the dude [the officers] were told about."[6] Petitioner speculates that the police received a tip about a black man with braids from an informant, which they did not want to disclose (R. 17 at 22, 32, 36, 40), but the record contains no evidence substantiating that either. As indicated above, Donovan did an open records request for reports about this alleged investigation but found none.

Thus, in order to establish what the government has called a "braids on the brain" theory,

---

[6]In reply, petitioner contends "Gregory would have had to admit that officers had been 'told about' the other black man with braids, as he stated on video." (R. 22 at 9.) At no point during the video did Gregory describe the "dude we were told about."

12

Donovan would have needed to call additional officers, who did not see what happened on the west side of the street; get them to admit that they were there on a mission to find a man with a gun who had this distinctive hairstyle, without any documentary evidence with which to cross-examine them on the key point; and then further demonstrate that Rivera had also been told to look for a suspect with braids. See Hicks, 886 F.3d at 651 ("[S]peculating about what might have been is not sufficient to show a reasonable probability of a different outcome.").[7]

Petitioner also argues that the additional evidence would have undercut the government's credibility, since the prosecutors told the jury the officers were simply "patrolling" the neighborhood. (R. 17 at 33, 48; R. 22 at 11, 13.) Neither of the testifying officers claimed that they just happened to be in the neighborhood; the specific reason why they were there simply did not come up at trial. In any event, petitioner fails to explain why making the case more complicated in order to potentially show inconsistency on an ancillary matter was so obviously the better strategy as to render Donovan's representation ineffective.

Petitioner further argues that Donovan could have bolstered the case by calling Schwarzhuber to introduce the footage from his body cam and/or squad dash cam, which, petitioner contends, provides a better view and shows him doing nothing suspicious. (R. 17 at 33, 44-45, 49; R. 22 at 11.) Donovan reviewed the video from the lead car, testifying that it neither proved nor disproved petitioner's possession of the gun; he also argued to the jury that the officers in the lead squad saw nothing. Having carefully reviewed the videos from the lead

---

[7]Petitioner suggests that Donovan could have established the "braids on the brain" theory without calling Gregory. Instead, he could have called Schwarzhuber to introduce his body cam and/or the squad dash cam showing the officers racing to the area and then seizing the man with dreadlocks on the other side of the street. (R. 17 at 42-43.) But this requires even more speculation to create a link between the officers' motives and petitioner's hairstyle.

13

squad car myself, as well as the still shots petitioner has produced from them, I am unable to

make out much of anything of significance on the west side of the street.[8] Someone tossed a

gun into the yard, which Donahue found right where River saw it land, and the videos from the

lead squad car do not show another person doing so.[9] While petitioner argues that the perfect

should not be the enemy of the good (R. 17 at 47), it is hard to see how these grainy

films/photos undermine confidence in the outcome.

Finally, even if petitioner could have shown through the additional evidence that the

officers were not on routine patrol but instead searching for a man on 23rd and Keefe with a

gun, this does not mean that petitioner was not also in possession of a gun in the area; as

Gregory said on his body cam video, "a random dude across the street threw a gun right in front

of Casey and Jose." Ultimately, however it may have been litigated, this case would have come

down to whether the jury believed Rivera. As the government aptly put it at the hearing, either

Rivera either saw what he saw on the west side of the street or he didn't. The jury decided to

believe him, and I see no reasonable probability that the additional evidence presented at the

evidentiary hearing would have changed that.

---

[8]Petitioner argues that Donovan's decision not to introduce these videos cannot be excused as strategy, since he did not specifically recall the basis for his decision. (R. 17 at 46; R. 22 at 12.) However, Donovan clearly testified that he reviewed the videos (Evid. Hr'g Tr. at 58), which petitioner concedes do not exculpate him (R. 17 at 45, 47). While he argues they provide a better view, petitioner makes no claim that the lead squad dash cam captured him at the precise moment when Rivera called out, "He threw a gun right there, braids." (See R. 17 at 49.) In reply, petitioner contends that it would have been simple and risk free for Donovan to supplement his defense by calling Schwarzhuber and walking him through what the videos from his car establish. (R. 22 at 7-9.) As discussed above, there is no reasonable probability these videos would have changed the outcome.

[9]Petitioner makes no claim that the gun was laying in the yard before the officers got there.

14

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that petitioner's motion (R. 1) is denied, and this case is dismissed.  The Clerk is directed to enter judgment accordingly.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2255 petitioner.  A COA may issue only if the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard for making a "substantial showing" is whether reasonable jurists could debate whether the motion should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement  to proceed further.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  For the reasons stated above, petitioner cannot make such a showing, so I decline to issue a COA.

Petitioner also filed a motion for leave to proceed without prepayment of the filing fee (R. 3), but because there is no filing fee for § 2255 actions in the district court (and petitioner has asserted no other costs) this motion is denied as moot.

Dated at Milwaukee, Wisconsin, this 26th day of February, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

15